Nancy G. MILLER and Kimball Eugene Miller, Appellants–Plaintiffs,

v.

John MARTIG, D.O., Nancy W. Griffith, M.D., New Castle Family Physicians, P.S.C., Henry County Memorial Hospital, Sally McCarty, Commissioner of the Indiana Department of Insurance, John M. Ross, Panel Chairman, Appellees–Defendants.

No. 33A01–0009–CV–326.

Court of Appeals of Indiana.

Aug. 27, 2001.

Stephen B. Caplin, Terry Kaiser Park, Samuel R. Robinson, Caplin Park Tousley & McCoy, Indianapolis, IN, Attorneys for Appellants.

Michael D. Conner, Spitzer Herriman Stephenson Holderead Musser & Conner, LLP, Marion, IN, Attorney for Appellee John Martig, D.O.

### OPINION

BAKER, Judge.

Appellants-plaintiffs Nancy and Kimball Miller (collectively, the Millers) appeal the trial court's grant of summary judgment in favor of the appellee-defendant, Dr. John Martig. Specifically, the Millers contend that the trial court lacked the authority to grant Dr. Martig's petition for a preliminary determination of law, and that the entry of summary judgment was inappropriate because genuine issues of material fact existed with regard to the standard of care. In essence, the Millers assert that a physician-patient relationship existed and the standard of care was breached when Dr. Martig, the "on-call" physician at the hospital, informed Nancy that he would not administer a spinal narcotic to her because he was not qualified to do so.

### FACTS [1]

On May 21, 1994, Nancy was an obstetrical patient at the Henry County Memorial Hospital (Hospital) under the care of Dr. Nancy Griffith. On that day, she was admitted to the Hospital for the inducement of labor. During that period, Dr. Griffith made an order for Dr. Martig, the "on call" anesthesiologist at the Hospital, to consult with Nancy regarding pain control. In accordance with the Hospital's bylaws, Dr. Martig had a contractual duty to be available when needed by the Hospital's patients. Hospital policy required its "on call" staff to be within thirty minutes of the building.

When Dr. Martig first consulted with Nancy, he explained to her that he did not administer epidurals [2] because he lacked proper training and experience regarding that type of pain management. Thus, he told Nancy that he "could not accept her case, and that she would need to consult further with Dr. Griffith regarding obstetrical pain management." Record at 37. Nancy does not dispute any portion of this conversation. ·R. at 98. Dr. Martig then left the hospital room and retired to the physician's lounge at the Hospital to sleep. Pursuant to the Hospital's policy, Dr. Martig was to inform the Hospital's switchboard operator as to his whereabouts. Dr. Martig testified that he notified the nurses of his location but that his beeper was not functioning properly.

Nancy initially claimed that Dr. Martig did not consult with her again until after the baby had been born. However, she later stated that Dr. Martig returned to her room before the birth and administered a shot of Demerol or some other pain control medication that did not ease her discomfort.

Dr. Griffith arrived at Nancy's hospital room at approximately 11:30 p.m. and per-

---

1. Oral argument was heard in this cause on June 19, 2001, in Indianapolis.

2. This is a form of nerve-block anesthesia. A needle is inserted in the lower back in a fashion similar to a spinal anesthesia. The needle is introduced past the spinous processes so that it will rest within the bony spinal column but not enter the membranes surrounding the spinal cord. Injection of local anesthetic drug into this space brings the local anesthetic drug into contact with the spinal nerve fibers after they have left the covering of the spinal cord. 3B *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties* § 25.31 (3d ed.1983).

formed a pelvic examination. The exam revealed that Nancy had a prolapsed cord that qualified as an obstetrical emergency. Thus, Dr. Griffith ordered that a Cesarean section (hereinafter, C-section) be performed. A nurse then paged Dr. Martig in an attempt to inform him of the situation. Because Dr. Martig could not be located, Dr. Griffith and one of the Hospital residents performed the C-section without an anesthetic and delivered the baby.

As a result of the incident, the Millers filed a proposed complaint with the Indiana Department of Insurance on April 30, 1996, alleging that Dr. Martig was negligent because he failed to provide anesthetic services to Nancy. Thereafter, Dr. Martig moved for summary judgment which the trial court subsequently granted. The trial court determined that a physician-patient relationship never existed between Nancy and Dr. Martig. Thus, Dr. Martig owed no duty to Nancy, and he committed no medical malpractice as a matter of law.[3] The Millers now appeal.

### DISCUSSION AND DECISION

#### I. Standard of Review

■ In reviewing a grant of summary judgment, this court applies the same standard as does the trial court. *USA Life One Ins. Co. v. Nuckolls,* 682 N.E.2d 534, 537 (Ind.1997). We do not weigh the evidence designated by the parties. Instead, we liberally construe the evidence in the light most favorable to the non-moving party. *Id.* Summary judgment is appropriate only if the pleadings and the evidence show both the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Butler v.*

*City of Indianapolis,* 668 N.E.2d 1227, 1228 (Ind.1996). Where material facts conflict, or undisputed facts lead to conflicting material inferences, summary judgment is inappropriate. *Id.*

■ We also note that when, as here, the trial court enters specific findings of fact and conclusions of law with respect to a summary judgment claim, we are not bound by those findings. Rather, the findings merely aid our review by providing reasons for the trial court's actions. *Rice v. Strunk,* 670 N.E.2d 1280, 1283 (Ind. 1996). If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we will affirm. *Havert v. Caldwell,* 452 N.E.2d 154, 157 (Ind.1983).

### II. The Millers' Claims

#### A. Preliminary Determination of Law

Nancy first challenges the trial court's authority to consider Dr. Martig's motion for a preliminary determination of law. Specifically, the Millers maintain that a medical review panel had not rendered an opinion with regard to the incident and, therefore, the trial court lacked jurisdiction to consider the matter. In essence, the Millers assert that the trial court could not decide this case because the medical review panel had not yet determined whether Dr. Martig had met the standard of care for on-call anesthesiologists.

■ In resolving this issue, we note that IND. CODE § 34–18–11–1 provides that material issues of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury, may be preliminarily determined in summary judgment proceedings prior to a medical review panel reviewing the case. Put another way,

---

**3.** Summary judgment was granted only with respect to the Millers' claim against Dr. Martig. The Millers had also named Dr. Griffith, New Castle Family Physicians, P.S.C. and the Hospital in their complaint. They are not parties to this appeal.

an issue that does not require expert opinion is not reserved to the medical review panel. *Santiago v. Kilmer*, 605 N.E.2d 237, 240–41 (Ind.Ct.App.1992), *trans. denied.*

In construing this statute, we note that this court observed in *Johnson v. Padilla*, 433 N.E.2d 393, 395–96 (Ind.Ct.App.1982), that a medical panel decision was not required in order to determine whether the defendant-physician had performed a certain medical procedure on the patient. We reasoned that a resolution of that issue did not require an expert opinion. Thus, the trial court had jurisdiction to resolve the matter. *Id.*

■ Here, the undisputed evidence shows that during the first consultation with Nancy, Dr. Martig informed her that he would not take her case because he was not qualified to administer spinal anesthetics. Thereafter, he retired to the physician's lounge to sleep. The lounge was approximately forty to fifty feet from the operating room, and the obstetrical nurse had contacted on-call physicians in this room in the past. R. at 37–38. As indicated above, the Hospital rules required on-call physicians to be within thirty minutes of the hospital to respond when contacted. None of the nurses or other hospital personnel attempted to contact Dr. Martig that evening, other than by telephoning his "beeper" which had been malfunctioning. R. at 140. It was not until 11:42 p.m. that Hospital personnel telephoned the physician's lounge. Dr. Martig immediately responded to that call and proceeded to Nancy's room, but he discovered that the C-section had already been performed.

Contrary to the arguments that the Millers advance, we find that an expert opinion is not required to determine whether Dr. Martig breached any duty to Nancy by his purported unavailability to render health care services as the Hospital's on-call anesthesiologist. Moreover, the undisputed facts here demonstrate as a matter of law that Dr. Martig did not breach any standard of care with respect to his availability to carry out his duties. Thus, the trial court did not err in assuming jurisdiction for the limited purpose of ruling on Dr. Martig's motion for summary judgment.

*B. Summary Judgment Claim*

The Millers go on to assert that even if the trial court acted properly in asserting jurisdiction in this matter, summary judgment in Dr. Martig's favor was erroneous because genuine issues of material fact exist. Specifically, they contend that whether Dr. Martig performed within the standard of care when treating Nancy and ultimately terminating the alleged physician-patient relationship were questions for the jury. Moreover, the Millers assert that summary judgment cannot stand because there is disputed evidence as to whether Dr. Martig saw Nancy a second time before the birth and administered medication to her for pain management.

As a preliminary matter, we note that the Millers have devoted a substantial portion of their appellate brief in support of the notion that a physician-patient relationship was established when Dr. Martig, as the on call anesthesiologist for the Hospital, informed Nancy that he could not administer spinal narcotics to her. The parties concede, and we agree, that there are no reported cases in Indiana as to when and if a physician-patient relationship may be established with respect to an on-call physician absent a contractual relationship between the physician and patient. We note, however, that this issue is left for another day, inasmuch as counsel for the Millers conceded or "clarified" at oral argument before this court that they are not seeking to impose liability upon

Dr. Martig merely because of his on-call status at the Hospital. Rather, the Millers contend that the disputed facts presented in this case gave rise to the existence of a physician-patient relationship between Nancy and Dr. Miller when he initially consulted with her. They further maintain that this relationship continued because Dr. Martig did not inform Nancy that he was no longer her physician.

Our supreme court has observed that the duty owed by a physician arises from the physician-patient relationship. Thus, a physician-patient relationship is a legal prerequisite to a medical malpractice cause of action. *See Dixon v. Siwy,* 661 N.E.2d 600, 607 (Ind.Ct.App.1996). Additionally, that duty arises from the contractual relationship entered into between the doctor and patient. *Walker v. Rinck,* 604 N.E.2d 591, 594 (Ind.1992). Generally, where a doctor does not treat, see, or in any way participate in the care or diagnosis of the plaintiff-patient prior to or during surgery, a doctor-patient relationship will not be found to exist. *Dixon,* 661 N.E.2d at 607. As noted in *Dixon,* our research has revealed "no authority for the proposition that a physician-patient relationship may be established without the physician performing some affirmative act with regard to the patient and without the physician's knowledge." *Id.* In the absence of a physician-patient relationship, there can be no liability on the part of the defendant physician, and the entry of summary judgment is appropriate. *Id.*

Here, Dr. Martig made no recommendation to Nancy regarding her condition or as to any course of treatment. Moreover, Dr. Martig did not participate in any course of treatment and did nothing to support an implication that he consented to the establishment of a physician-patient relationship. To the contrary, Dr. Martig informed Nancy that he would not take her case. As a result, no physician-patient relationship was established, and summary judgment was properly entered for Dr. Martig.

In a related argument, however, Nancy attempts to create a genuine issue of material fact through her own testimony that established the existence of the physician-patient relationship. Specifically, Nancy initially stated in her answers to interrogatories that Dr. Martig did not return to her room until after she had given birth to her baby. However, two years later, in deposition testimony, she asserted that Dr. Martig returned to the room before the birth and administered some pain medication. We note that this court will not permit such contradictory and self-serving testimony to create a genuine issue of material fact. *See Gaboury v. Ireland Rd. Grace Brethren, Inc.,* 446 N.E.2d 1310, 1314 (Ind.1983) (holding that contradictory testimony contained in an affidavit of the nonmoving party may not be used by him to defeat a summary judgment motion where the only issue of fact raised by the affidavit is the credibility of the affiant); *see also Hockett v. Breunig,* 526 N.E.2d 995, 999 (Ind.Ct.App.1988) (summary judgment was proper where opponent's credibility was placed in issue due to his present position on an issue being inconsistent with prior in-court statements). Here, Nancy is precluded from creating a genuine issue of material fact by putting her own credibility at issue. There was no error.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court had jurisdiction to make a preliminary determination of law and to rule on Dr. Martig's motion for summary judgment. We note that an expert opinion was not necessary here to make a determina-

tion that Dr. Martig was available to render health care when the evidence demonstrated that he was within forty to fifty feet of the operating room. Moreover, we conclude that Nancy failed to demonstrate, as a matter of law, that a physician-patient relationship had been established between Dr. Martig and Nancy. Thus, summary judgment was properly entered for Dr. Martig.

Judgment affirmed.

FRIEDLANDER, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting

I respectfully dissent. The elements of a negligence claim are familiar to any first-year law student: duty, breach, proximate cause, and damages. *See* William L. Prosser, THE LAW OF TORTS, § 30, at 146 (3d ed.1964). Liability for the failure to act requires "some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." *Id.* note 42, § 54 at 335; *See also* Restatement (Second) of Torts § 314 cmt. c. (1965).

*Hiser v. Randolph,* 126 Ariz. 608, 617 P.2d 774 (Ct.App.1980), was one of the earliest cases imposing malpractice liability under a contract, despite a lack of personal contact between the parties. Dr. Randolph, the on-call physician, refused to treat Hiser who had arrived at the hospital in a semi-comatose condition due to diabetes. Dr. Randolph told the nurse to call the patient's treating physician who then refused to come in claiming that Dr. Randolph was on call and therefore responsible to the patient. The chief-of-staff eventually came to treat the patient who died the next day. Dr. Randolph asserted he had no duty to treat the patient. In reversing the summary judgment granted in Dr. Randolph's favor, the Arizona Court of Appeals observed that in accepting payment for his on-call services and consenting to hospital by-laws, Dr. Randolph was obligated to treat Hiser.

While the various doctors in this case indicated that they were of the belief they had the right to refuse to treat an individual under varying circumstances, the obviously intended effect of the by-laws and rules and regulations [of the hospital] was to obligate the emergency room doctor 'on call' to provide emergency treatment to the best of the doctor's ability to any emergency patient of the hospital.

*Id.* at 777–78.

The Millers also direct us to *McKinney v. Schlatter,* 118 Ohio App.3d 328, 692 N.E.2d 1045, 1050 (1997). In that case the court determined that whether a physician-patient relationship existed between a patient and an on-call cardiologist was a question for the jury.

The *Hiser* and *McKinney* cases are easily reconciled with relevant portions of the Henry County Memorial Hospital Bylaws which provide: "[T]he members of the Medical Staff must accept and carry out such responsibility as the agents of the Governing Body in cooperation with the Administration of the Hospital in order to fulfill the Hospital's obligation to its patients." R. 117. In light of this provision, and the result reached in *Hiser*, a patient-physician relationship between Mrs. Miller and Dr. Martig was first established by contract.

The physician-patient relationship between Mrs. Miller and Dr. Martig was also established as Dr. Martig provided health care service to Mrs. Miller. Under the Bylaws the term "consultation means the rendering of patient consultation services by a practitioner upon a written request from the patient's admitting or co-admit-

ting practitioner ..." Dr. Griffith, Mrs. Miller's doctor, had called the obstetrical nurse and requested that Dr. Martig be contacted. It was Dr. Griffith's request that Dr. Martig talk to Mrs. Miller about spinal narcotics. Based on this request, Dr. Martig actually consulted with Mrs. Miller.

When Dr. Martig talked to Mrs. Miller at Dr. Griffith's request, he was providing patient consultative services regarding "an act ... for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement .... at the Hospital." Ind.Code § *34–18–2–13*. Whether Dr. Martig's consultative services met the standard of care was a question of fact for the Medical Review Panel to decide.

Mrs. Miller was a foreseeable patient at the hospital and Dr. Martig's attempt to delegate his on-call duty to Dr. Griffith failed because Dr. Griffith was not qualified as an on-call anesthesiologist Dr. Martig's presence as an "on-call" anesthesiologist created a false sense of security that an anesthesiologist would be available to treat emergency obstetrical situations on which Mrs. Miller relied. Perhaps, if Mrs. Miller had known of Dr. Martig's inability to perform epidurals, she may have gone to a different hospital that had a qualified anesthesiologist on-call. Given the uncontroverted evidence of the hospital by-law requirements, Mrs. Miller had a reasonable expectation of a contract between the hospital and Dr. Martig requiring him to provide emergency room treatment when on call.

The question remains, however, as to whether Dr. Martig met the standard of care for on-call anesthesiologists and the answer to that issue should not have been decided by a preliminary determination of the trial court. Once a doctor-patient relationship gives rise to a duty, the plaintiff must prove that the doctor violated the standard of care practiced by the same type of physician in his community.

Where the hospital has exercised reasonable care in administering its emergency room procedures, but the on-call physician has failed to exercise reasonable care in undertaking his attendant duties, the liability falls on the physician as the party in the best position to prevent the negligent act.

The trial court exceeded its jurisdictional authority to make a preliminary determination of law under the Medical Malpractice Act because the physician-patient relationship was established, as a matter of law, when Dr. Martig contracted with Henry County Memorial Hospital to provide anesthesia for its hospitalized patients.

I would reverse the trial court's grant of summary judgment in favor of the appellee-defendant, Dr. John Martig.