Sharon KUESTER and Daniel Kuester, Appellants–Plaintiffs,

v.

Margaret M. INMAN, M.D., Eagle Highlands General Surgery, P.C., Tenet Healthcare Corporation, Winona Memorial Hospital, Limited Partnership, Republic Health Corporation of Indianapolis and OrNda Hospital Corporation, Appellees–Defendants.

No. 49A04–0104–CV–150.

Court of Appeals of Indiana.

Nov. 16, 2001.

98

C. Warren Holland, Michael W. Holland,
Holland & Holland, Indianapolis, Indiana,
Attorneys for Appellants.

Julia Blackwell Gelinas, Kevin Charles
Murray, Allison S. Avery, Locke Reynolds,
David Becsey, Lakshmi Reddy, Zeigler,
Cohen & Koch, Indianapolis, Indiana, At-
torneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In July 1997, surgeons perforated Shar-
on Kuester's stomach while performing a
silastic ring vertical gastroplasty,[1] and
Sharon suffered injuries as a result. Shar-

---

1. This surgical procedure attempts to lessen the stomach's capacity to hold food, thereby helping those who are severely obese to lose weight.

on and her husband Daniel (collectively "Kuesters") filed a proposed medical malpractice complaint with the Indiana Department of Insurance and, subsequently, a complaint in Marion Superior Court alleging fraud against Dr. Margaret M. Inman, Eagle Highlands General Surgery, P.C., Winona Memorial Hospital, Ltd., Tenet Healthcare Corporation, Republic Health Corporation of Indianapolis, and OrNda Hospital Corporation (collectively "Defendants"). Upon Defendants' motion, the trial court found that the Kuesters' fraud allegations were subject to Indiana's Medical Malpractice Act ("Act")[2] and dismissed their complaint for lack of subject matter jurisdiction.[3] The Kuesters appeal that dismissal and raise the following dispositive issue for our review, namely, whether the trial court erred when it dismissed the Kuesters' fraud complaint.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In April 1997, Sharon contacted the LiteLife program at Winona Memorial Hospital about participating in the hospital's bariatric surgery program.[4] By phone interview with a LiteLife staff member, Sharon completed a patient profile that included such personal information as her family medical history, her past illnesses and surgical procedures, current insurance and prescribed medications, and questions about physiological symptoms related to her obesity.

Based on this information, the hospital scheduled Sharon for a bariatric surgery consultation with Dr. Inman on May 13, 1997. Prior to her consultation, Sharon completed an additional patient informa-

tion sheet and insurance authorization form, allowing Defendants to release information and submit insurance claim forms to Sharon's insurance company. Sharon also agreed to be responsible for all deductibles and non-covered medical services.

At the May 13th consultation, Dr. Inman discussed the silastic ring vertical gastroplasty with several people, including Sharon. Dr. Inman explained the procedure, reassured the people that the surgery was safer than the similar Roux–en–Y procedure, and stated that LiteLife ran the best morbid obesity program in Indiana. Relying on Dr. Inman's representations, Sharon underwent the silastic ring vertical gastroplasty surgery in July 1997. During the procedure, however, the doctors perforated Sharon's stomach in two places and, due to ensuing complications, converted the surgery to a Roux–en–Y gastric bypass.

In February 1998, the Kuesters filed a proposed medical malpractice complaint with the Indiana Department of Insurance. Then, in January 2000, the Kuesters filed a civil fraud action against Defendants alleging that Dr. Inman, during the May 1997 consultation, made fraudulent representations regarding the LiteLife program and the silastic ring vertical gastroplasty procedure. Defendants moved to dismiss the Kuesters' fraud complaint, arguing that the action was subject to the Act and that the trial court, therefore, lacked subject matter jurisdiction. After a hearing, the trial court agreed that it lacked subject matter jurisdiction and

---

2. *See* Ind.Code § 34–18–1–1 et seq.

3. *See* Indiana Rule of Trial Procedure 12(B)(1).

4. "Bariatric" surgery is a general term used to describe that class of surgery designed to promote weight loss.

dismissed the Kuesters' fraud complaint without prejudice.[5] This appeal followed.[6]

## DISCUSSION AND DECISION

### Standard of Review

The applicable standard of review for Trial Rule 12(B)(1) motions to dismiss is a function of what occurred in the trial court. *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001). "That is, the standard of review is dependent upon: (i) whether the trial court resolved disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a 'paper record.'" *Id.* If the facts before the trial court are not in dispute, then the question of subject matter jurisdiction is purely one of law. *Id.* Under those circumstances no deference is afforded the trial court's conclusion because "appellate courts independently, and without the slightest deference to trial court determinations, evaluate those issues they deem to be questions of law." *Id.* (Citation omitted).

If, however, the parties dispute the facts presented to the trial court, then our standard of review focuses on whether the trial court conducted an evidentiary hearing. *Id.* Under those circumstances, the court engages in its fact-finding function, often evaluating the character and credibility of witnesses. *Id.* Accordingly, when a trial court conducts an evidentiary hearing, we give deference to its factual findings and judgment, and we will reverse only if the findings and judgment are clearly erroneous. *Id.*

However, where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment. *Id.* And where, as in this case, the facts are in dispute and the trial court conducts a hearing where no evidence was presented (only arguments by counsel) and the court made no findings of fact, the reviewing court is "in as good a position as the trial court to determine whether the court has subject matter jurisdiction." *Id.* (Citation omitted). We thus review de novo the trial court's ruling in this case.

### Subject Matter Jurisdiction

The Kuesters contend that the trial court erred when it granted Defendants' motion to dismiss their fraud complaint for lack of subject matter jurisdiction. Specifically, the Kuesters argue that no physician-patient relationship existed between Sharon and Dr. Inman, and that their fraud complaint was, therefore, not subject to the Act's requirement that malpractice complaints be filed with the Indiana Department of Insurance. We cannot agree.

Under the Act, malpractice is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." Ind.Code § 34–18–2–18. Similarly, the Act defines a patient as:

**5.** We note that dismissal for lack of jurisdiction is a final, appealable judgment. *See Browning v. Walters*, 616 N.E.2d 1040, 1044 (Ind.Ct.App.1993).

**6.** Save for Dr. Inman and Eagle Highlands General Surgery, the Kuesters filed a previous action against the same defendants arising from Sharon's injury. In the prior case, the Kuesters alleged that the defendants negligently credentialed certain physicians, and that such was not a malpractice claim subject to the Act's requirements. We disagreed, holding that credentialing is directly related to the provision of health care and is, therefore, not excluded from the Act. *Winona Memorial Hosp. v. Kuester*, 737 N.E.2d 824, 828 (Ind.Ct.App.2000).

[A]n individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider.

Ind.Code § 34–18–2–2. These terms, and the Act in general, apply to conduct, curative or salutary in nature, by a health care provider acting in his or her professional capacity, and are designed to exclude only that conduct "unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Van Sice v. Sentany,* 595 N.E.2d 264, 266 (Ind.Ct.App.1992) (Citation omitted).

 The duty owed by a physician arises from the physician-patient relationship. *Miller v. Martig,* 754 N.E.2d 41, 46 (Ind.Ct.App.2001). That relationship is a consensual one, where the patient knowingly seeks the assistance of a physician and the physician knowingly accepts her as a patient. *Walters v. Rinker,* 520 N.E.2d 468, 472 (Ind.Ct.App.1988). The important fact in determining whether the relationship is consensual, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for her benefit. *Id.* In order for a physician-patient relationship to develop, the physician must perform some affirmative act for the patient's benefit. *Dixon v. Siwy,* 661 N.E.2d 600, 607 (Ind.Ct.App.1996). The physician-patient relationship is a legal prerequisite to a medical malpractice cause of action. *Martig,* 754 N.E.2d at 41. Without that relationship, there can be no liability on the part of the defendant health care provider. *Id.*

 In this case, Sharon contacted the LiteLife program about becoming a pa-tient. Through an initial phone interview with Sharon, hospital personnel created a document entitled "LiteLife Patient Profile." Appellant's App. at 207. During the interview, Sharon answered questions about allergies, current medications, past illnesses and surgical history, alcohol and substance use history, family medical history, adverse physical symptoms (ranging from joint or back pain to neurological history), bowel, bladder, or gynecological problems, and sexual dysfunction. *See* Appellant's App. at 208–09. Based on the information that she provided, Sharon was scheduled for an appointment with Dr. Inman, who was then listed as Sharon's doctor on her patient profile.

Prior to her office visit, Sharon also completed a "Patient Information" form, which included additional information regarding current and prior medical afflictions, including "current medication," and family history of specific diseases. Appellant's App. at 212–14. Sharon signed an accompanying "Insurance Authorization and Assignment," whereby she permitted Defendants to "release information and submit insurance claim forms on [her] behalf," and agreed to pay for "all deductibles, coinsurance and non-covered services." Appellant's App. at 212. Sharon further agreed to "pay any and all legal and collection fees accrued due to failure to pay for services rendered." Appellant's App. at 212.

 These acts were clearly done for the purpose of diagnosing and/or treating Sharon. *See Walters,* 520 N.E.2d at 471. The fact that Dr. Inman had not yet physically examined, prescribed medication, or otherwise treated Sharon does not preclude the formation of a doctor-patient relationship. *See Walters,* 520 N.E.2d at 471; *see also Scruby v. Waugh,* 476 N.E.2d 533, 536 (Ind.Ct.App.1985) (finding third party may initiate physician-patient

relationship on patient's behalf). Further, the scope of the Act is not limited to examining, treating or prescribing medication. *Walters*, 520 N.E.2d at 471. The statute covers any act performed by a health care provider in that provider's capacity. *Id.; see* I.C. § 34–18–2–3. In this case, the act performed occurred when, after taking Sharon's medical history, Dr. Inman scheduled her for a consultation. Thus, under the Act, a physician-patient relationship existed prior to the May 13, 1997, consultation at which Dr. Inman allegedly made fraudulent representations.

That, however, is not the end of our inquiry. While a doctor-patient relationship is a prerequisite to maintaining a malpractice action, the existence of that relationship does not necessarily preclude other causes of action. To avoid the Act's requirements, the Kuesters would have to prove that Dr. Inman's allegedly fraudulent statements were unrelated to the promotion of Sharon's health or Dr. Inman's exercise of professional expertise, skill, or judgment. *See Van Sice*, 595 N.E.2d at 266; *Boruff v. Jesseph*, 576 N.E.2d 1297, 1298 (Ind.Ct.App.1991). This they cannot not do.

To establish fraud, the Kuesters must prove, among other things, that Dr. Inman made a false statement of past or existing material fact. *Baxter v. I.S.T.A. Ins. Trust*, 749 N.E.2d 47, 52 (Ind.Ct.App. 2001). In their complaint, the Kuesters allege that Dr. Inman misrepresented to Sharon that the LiteLife program was "the only good morbid obesity program" in Indiana, the silastic ring procedure was safe, and was actually safer than the Roux–en–Y procedure, and that the silastic ring procedure was "routine"—"all the kinks were ironed out, and the surgery was just automatic." Appellant's App. at 39–40. To prove these claims were fraudulent, Sharon had to demonstrate significant contradictory evidence showing that there were other "good" obesity programs in Indiana, the silastic ring procedure was *not* safer than the Roux–en–Y procedure, and the surgery was not "automatic." Such evidence goes to the core of whether the silastic ring procedure was a proper or recommended course of treatment in keeping with Dr. Inman's representations. The question of whether a given course of treatment is medically proper or, as in this case, lives up to a doctor's representations concerning its propriety and effectiveness, is the quintessence of a medical malpractice case. *See Van Sice*, 595 N.E.2d at 267. Indeed, the sole duty of the medical review panel is "to express its opinion as to whether or not the evidence supports the conclusion that the defendant ... acted or failed to act within the appropriate standards of care." *Id.* Here, as in *Van Sice*, the Kuesters' claim for fraud is actually one for medical malpractice and is, therefore, subject to the Act.[7] *Id.*

## CONCLUSION

A physician-patient relationship existed prior to Sharon's May 13, 1997, consultation with Dr. Inman. Further, the Kuesters cannot, as a matter of law, establish that Dr. Inman's representations were unrelated to the promotion of Sharon's health or Dr. Inman's exercise of professional expertise, skill, or judgment. Thus, the Kuesters fraud claim is one for malpractice and falls within the Act. They were, therefore, required first to submit their claim to a medical review panel. The trial

---

7. The Kuesters also argue that the trial court erred when it granted defendants' Dr. Inman and Eagle Highlands General Surgery motion to strike the Kuesters' supplemental affidavit of Sharon. However, since we find that the trial court correctly dismissed the Kuesters' claim for lack of subject matter jurisdiction, we need not address this argument.

court correctly found that it lacked subject matter jurisdiction to decide the Kuester's claim and did not err when it granted Defendants' motion to dismiss. The judgment of the trial court is affirmed.

Affirmed.

SHARPNACK, C.J., and RILEY, J., concur.