Cathy A. THAYER and Mark Thayer, Appellants–Plaintiffs,

v.

Michael OrRICO, Ph.D., Appellee–Defendant,

Sally McCarty, Commissioner, Indiana Department of Insurance, Non–Participating Appellee.

No. 79A02–0211–CV–974.

Court of Appeals of Indiana.

Aug. 6, 2003.

Andrew C. Charnstrom, Wooden & McLaughlin, LLP, Indianapolis, IN, Attorney for Appellants.

Peter H. Pogue, Donald B. Kite, Sr., Michael Roth, Schultz & Pogue, LLP, Carmel, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Cathy Thayer ("Thayer") was employed at Lafayette Clinic, Inc. at which Dr. Michael OrRico ("OrRico"), a psychologist, maintained his professional practice. While she was employed at the Clinic, Thayer sought OrRico's advice concerning problems she was having with her children and her marriage. In 1999, Thayer and her husband filed a complaint against OrRico in Tippecanoe Superior Court alleging in part that OrRico and Thayer had a therapist-patient relationship, and that OrRico committed medical malpractice in his treatment of Thayer. OrRico filed a motion for partial summary judgment arguing that he and Thayer did not have a therapist-patient relationship. The trial court granted that motion, and the Thayers appeal arguing that the trial court erred

when it determined that OrRico and Thayer did not have a therapist-patient relationship. Concluding that a genuine issue of material fact exists regarding the existence of a therapist-patient relationship, we reverse.

**Facts and Procedural History**

The facts most favorable to the nonmovant reveal that OrRico and Dr. Nizar El Khalili, a psychiatrist, each owned fifty percent of the stock in Lafayette Clinic, Inc. ("the Clinic"), where they maintained their professional practices. In 1988, Thayer was employed by the Clinic as a receptionist, and in 1996, she was promoted to the position of front office manager. In 1990, Thayer began to suffer from depression after several deaths occurred in her family, and she began to take antidepressant medication prescribed for her by Dr. El Khalili.

During her employment at the Clinic, Thayer sought advice concerning problems she was having with her children and her marriage from her fellow co-workers and OrRico. With regard to her children, Thayer sought advice concerning her children's school performance and behavior from OrRico. OrRico discussed Thayer's son's learning disabilities with her on a frequent basis and also gave her advice about parenting and discipline. Appellant's App., Tab M, p. 21. Thayer and OrRico also had discussions regarding Thayer's relationship with her husband, including their sexual relationship. Appellant's App., Tab M, p. 15. Thayer never made appointments with OrRico, she was never billed for his services, and OrRico did not keep any records of their discussions.

In January 1997, Thayer and OrRico began to have a sexual relationship, which continued for approximately one year. During that time, Thayer continued to

seek advice regarding her marital relationship. Also, in 1997, OrRico told Thayer that she should discontinue any use of the anti-depressant drugs prescribed for her by Dr. El Khalili and recommended that Thayer undergo herbal treatments for her headaches and depression, which OrRico provided for her. Appellant's App., Tab M, p. 22. In September 1997, Thayer resigned from her employment at the Clinic, and shortly thereafter, OrRico ended their sexual relationship.

In 1999, Thayer and her husband, Mark, filed a complaint against OrRico [1] in Tippecanoe Superior Court raising several claims including medical malpractice. Specifically, Thayer alleged that OrRico "had a duty to conform to the applicable standard of care in [his] treatment of Cathy [Thayer], including using information from Cathy [Thayer] solely for her benefit, responding carefully to transference of her feelings, and planning her care subsequent to her release." Appellant's App., Tab D, p. 3. A proposed complaint was also filed with the Indiana Department of Insurance. On February 26, 2002, OrRico filed a motion for partial summary judgment arguing that he was entitled to judgment as a matter of law on Thayer's claims for medical malpractice because OrRico and Thayer did not have a therapist-patient relationship.

On May 6, 2002, the Thayers filed their brief in opposition to OrRico's summary judgment motion and submitted an affidavit from Dr. Toner Overley, a psychiatrist and professor at Indiana University's School of Medicine. In the affidavit, Dr. Overley opined that Thayer and OrRico had developed a "de facto" therapist-patient relationship arising from Thayer "seeking Dr. OrRico's professional advice and counsel for various matters including her sons' emotional and psychological problems, her own marital problems and her lack of self esteem." Appellant's App., Tab M, p. 5. Dr. Overley also stated:

8. Through these consultations, Dr. OrRico learned significant and intimate details of Cathy's [Thayer's] life and psychological state and developed a relationship of trust and support with Cathy [Thayer].

9. In my opinion, Cathy [Thayer] became dependent on Dr. OrRico and his professional therapeutic advice.

10. Transference is a phenomenon that arises during a therapeutic relationship where a patient projects positive or negative feelings for individuals from their past experiences onto a therapist. The patient may believe that he or she is in love with the therapist or develop strong negative feelings toward the therapist when those feelings are completely misplaced. The patient may also believe that the feelings are reciprocated.

11. Transference arises from the intimate nature of the communications in therapy.

12. In my opinion, Cathy [Thayer] developed a strong, positive transference to Dr. OrRico, believed that she had fallen in love with him and that he had fallen in love with her.

13. In my opinion, Dr. OrRico abused their therapeutic relationship by mishandling the transference phenomenon and engaged in a sexual relationship with Cathy [Thayer].

Appellant's App., Tab M, pp. 5–6.

On September 24, 2002, the trial court entered partial summary judgment in fa-

---

1. Dr. El Khalili and the Clinic were also named as defendants; however, Thayer's claims against them were later dismissed with prejudice. Therefore, only the claims against OrRico remain to be litigated.

vor of OrRico. In its order, the court stated,

> in order for a cause of action for medical malpractice to lie here, Dr. OrRico and Mrs. Thayer would need to have entered into a therapist/patient relationship, the transference would need to have been induced for the treatment of the patient, and then Dr. OrRico would need to have misused that transference to allow the relationship to become a sexual one. That is not what occurred here.

Appellant's App., Tab C, p. 3. The trial court then determined that no therapist-patient relationship was established, and "OrRico was merely counseling Mrs. Thayer as his employee and friend concerning her difficulties with her children and her husband." *Id.* The court also found that Dr. Overley's affidavit was of "marginal utility."[2] *Id.* at 4. The Thayers then filed a motion to correct error, which was denied. The Thayers now appeal. Additional facts will be provided as necessary.

## Standard of Review

Our standard of review of a summary judgment motion is the same standard used in the trial court:

> Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink,* 741 N.E.2d 343, 346 (Ind.2001) (citations omitted). "A party seeking summary judgment bears the burden of showing the absence of a factual issue and his entitlement to judgment as a matter of law." *Harco, Inc. of Indianapolis v. Plainfield Family Dining Assoc.,* 758 N.E.2d 931, 937 (Ind.Ct.App.2001) (citation omitted). All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *May v. Frauhiger,* 716 N.E.2d 591, 594 (Ind.Ct.App.1999).

For summary judgment purposes, a fact is "material" if it bears on ultimate resolution of relevant issues. *Yin v. Soc'y Nat'l Bank Ind.,* 665 N.E.2d 58, 64 (Ind.Ct.App. 1996), *trans. denied.* "[A]ny doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party." *Am. Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 428 (Ind.Ct.App. 1996). "Even if it appears that the nonmoving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences." *Link v. Breen,* 649 N.E.2d 126, 128 (Ind.Ct.App. 1995), *trans. denied.* Finally, "[o]ur analysis proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use." *Bunch v. Tiwari,* 711 N.E.2d 844, 847 (Ind.Ct.App.1999).

## Discussion and Decision

■ The Thayers argue that a genuine issue of fact remains as to whether OrRico and Thayer had established a therapist-patient relationship, and therefore, the trial court erred when it granted OrRico's

---

**2.** OrRico filed a motion to strike Dr. Overley's affidavit, which was denied. OrRico does not

challenge that ruling in this appeal.

motion for partial summary judgment.[3] It is undisputed in this case that OrRico, as a psychologist, is a "healthcare provider" as that term is defined in Indiana's Medical Malpractice Act ("the Act"). *See* Ind.Code § 34–18–2–14 (1998). Under the Act, a patient is defined as "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." Ind.Code § 34–18–2–22 (1999).

■■■ "In malpractice cases, health care providers must exercise that degree of care, skill, and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class acting under the same or similar circumstances." *Grzan v. Charter Hosp. of Northwest Ind.*, 702 N.E.2d 786, 790 (Ind.Ct.App.1998) (citing *Vergara v. Doan*, 593 N.E.2d 185, 187 (Ind.1992)). The Act and its provisions "apply to conduct, curative or salutary in nature, by a health care provider acting in his or her professional capacity, and are designed to exclude only that conduct 'unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.'" *Kuester v. Inman*, 758 N.E.2d 96, 101 (Ind.Ct.App.2001) (quoting *Van Sice v. Sentany*, 595 N.E.2d 264, 266 (Ind.Ct.App. 1992)).

■■ "The duty owed by a physician arises from the physician-patient relationship." *Id.* (citing *Miller v. Martig*, 754 N.E.2d 41, 46 (Ind.Ct.App.2001)).

That relationship is a consensual one, where the patient knowingly seeks the assistance of a physician and the physician knowingly accepts her as a patient. The important fact in determining whether the relationship is consensual, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for her benefit. In order for a physician-patient relationship to develop, the physician must perform some affirmative act for the patient's benefit. The physician-patient relationship is a legal prerequisite to a medical malpractice cause of action.

*Id.* (internal citations omitted). If a physician-patient relationship has not been established, there can be no liability on the part of the defendant health care provider. *Id.*

There are very few cases in Indiana addressing the issue of the existence of a therapist-patient relationship. In *Grzan*, the plaintiff alleged that Greer, a part-time "mental health counselor" employed by the defendant, Charter Hospital, rendered health care as a "therapist" and engaged in malpractice by mishandling the transference phenomenon. 702 N.E.2d at 789–90. Observing that in Indiana "individuals engaging in the practice of psychotherapy

---

**3.** The Thayers have alleged that OrRico engaged in malpractice by mishandling the transference phenomenon. This phenomenon "refers to the process whereby the patient unconsciously displaces onto the psychotherapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly." *Grzan v. Charter Hosp. of Northwest Ind.*, 702 N.E.2d 786, 791 (Ind.Ct.App.1998). Both the Thay-

ers and OrRico include significant discussions of the transference phenomenon and OrRico's alleged mishandling of that phenomenon in their briefs. However, the only issue raised in OrRico's motion for summary judgment is whether a therapist-patient relationship was established between OrRico and Thayer. Appellant's App., Tab H. Therefore, that is the only issue properly before this court and we limit our discussion to a resolution of that issue.

are required to be licensed psychiatrists, psychologists, certified clinical social workers, or certified marriage and family therapists," we noted that Greer did not fall into any of those categories. *Id.* at 791–92. Also, there was no evidence that Greer had knowledge or formal training of psychotherapeutic principles such as transference; therefore, he was not a therapist and no therapist-patient relationship existed between the plaintiff and Greer. *Id.* at 792; *see also Doe by Roe v. Madison Ctr. Hosp.,* 652 N.E.2d 101, 107 (Ind.Ct.App. 1995) (Plaintiff's claim against hospital did not fall within the scope of the Act where the plaintiff failed to allege that she had a therapist-patient relationship with a hospital employee/volunteer or that said employee rendered any psychiatric treatment or counseling to her.).

Other states have developed a variety of tests to determine whether a therapist-patient relationship has been established. Because our Indiana courts have not fully dealt with this issue, we turn to cases from those jurisdictions for guidance. In Utah, the relevant inquiry is whether the individual "consulted with or was examined by a mental health therapist for the purpose of receiving treatment." *See Debry v. Goates,* 999 P.2d 582, 586 (Utah Ct.App. 2000), *cert. denied.* In Georgia, the established rule is that the psychiatrist-patient relationship exists "to the extent that treatment was given or contemplated." *See Mrozinski v. Pogue,* 205 Ga.App. 731, 423 S.E.2d 405, 408 (1992), *cert. denied. See also Middleton v. Beckett,* 960 P.2d 1213, 1216 (Colo.Ct.App.1998) (where the psychiatrist had not undertaken any medical responsibility, subjected the individual to any tests, or prescribed any medication, no physician-patient relationship was created). In addition, states that have defined the psychotherapist-patient privilege by statute or court rule generally define the term "patient" to include a person

"who consults or is examined or interviewed by a psychotherapist." *See* Ala. Evidence Rule 503 (2003). *See e.g.* Alaska Evid. R. 504 (2003); Cal. Evid.Code § 1011 (2003); Del. Evid. R. 503 (2002); Fla. Stat. § 90.503 (2002); Ky. Evid. R. 507 (2003) (Patient is defined as a person "who for the purpose of securing diagnosis or treatment of his or her mental condition, consults a psychotherapist."); N.D. Evid. R. 503; Or.Rev.Stat. § 40.230 (2001).

■ In determining whether a physician-patient relationship has been established, Indiana courts have generally looked to whether 1) the physician makes a recommendation to the patient regarding her condition or as to any course of treatment; 2) whether the physician participated in any course of treatment; and 3) whether the physician performed some act which would support an inference that he or she consented to the establishment of a physician-patient relationship. *See Martig,* 754 N.E.2d at 46. We will also consider a physician's own statement to the patient indicating the physician's refusal to take the patient's case. *See id.* Ultimately, our review of the relevant case law leads us to the conclusion that the key inquiry is whether the physician has performed an affirmative act for a patient's benefit. *See Dixon v. Siwy,* 661 N.E.2d 600, 607 (Ind.Ct.App.1996) (citing *Walters v. Rinker,* 520 N.E.2d 468, 471 (Ind.Ct. App.1988), *trans. denied );* see also *Kuester,* 758 N.E.2d at 101; *Miller,* 754 N.E.2d at 46.

■ Similar inquiries are made when we are called upon to address the existence of an attorney-client relationship. Where there has been no executed employment agreement or payment of attorney fees, an attorney-client relationship may be implied "where a person seeks advice or assistance from an attorney, where the

advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Matter of Anonymous,* 655 N.E.2d 67, 70 (Ind.1995) (citation omitted); *see also In re Thayer,* 745 N.E.2d 207, 209 (Ind.2001); *Douglas v. Monroe,* 743 N.E.2d 1181, 1184 (Ind.Ct. App.2001). In addition, the putative client's subjective belief that he is consulting a lawyer in his professional capacity and his intention to seek professional advice are important factors that are considered in addressing that issue. However, "the relationship is consensual, existing only after both attorney and client have consented to its formation," and therefore, a "would-be client's unilateral belief cannot create an attorney-client relationship." *Douglas,* 743 N.E.2d at 1184–85 (citations omitted).

 Relying on our courts' discussions of physician-patient and attorney-client relationships and considering how other jurisdictions have addressed this issue, we conclude that the following factors should be considered when determining whether a therapist-patient relationship exists:[4] 1) whether the individual consulted with or was examined by a therapist for the purpose of receiving treatment; 2) whether the therapist made a recommendation to the individual regarding his or her condition or as to any course of treatment; and 3) whether the therapist performed some affirmative act which would support an inference that he or she consented to the establishment of a therapist-patient relationship.

In this case, Thayer has alleged that while she was employed at the Clinic, she sought advice from OrRico concerning problems she was having with her children's school performance and behavior, in addition to problems in her marriage. OrRico discussed Thayer's son's learning disabilities with her on a frequent basis and also gave her advice about parenting and discipline. Appellant's App., Tab M, p. 21. Thayer and OrRico had discussions regarding Thayer's relationship with her husband, including their sexual relationship. Appellant's App., Tab M, p. 15. Most importantly, Thayer has also alleged that in 1997, OrRico told Thayer that she should discontinue any use of the antidepressant drugs prescribed for her by Dr. El Khalili, and OrRico recommended that Thayer undergo herbal treatments for her headaches and depression, which he provided for her. Appellant's App., Tab M, p. 22. In addition, OrRico never made a clear statement to Thayer indicating that he did not consider their discussions to be professional consultations.[5] Appellant's App., Tab M, p. 12. On the other hand, OrRico has stated that he never scheduled appointments with Thayer, never billed her for his services, and that like the other employees of the Clinic from whom Thayer sought advice, he only gave her advice as a friend, not as a therapist. Finally, Thayer's expert, Dr. Overley, opined that OrRico and Thayer had established a therapist-patient relationship.

---

**4.** This list of factors is by no means exhaustive, but merely a starting point in this developing area of the law.

**5.** When he was deposed, OrRico was asked if he told Thayer that he did not consider the nature of their discussions to be professional consultations. OrRico stated that he had and indicated that he never made appointments or developed a professional relationship with

her. Appellant's App., Tab M, p. 12. The following exchange then occurred:

> Q: How did you make it clear to her that you did not consider your consultations to be professional consultations?
> A: That was never brought up in the context of casual conversation between friends in an office.
> *Id.*

It is undisputed in this case that Thayer sought and received advice from OrRico concerning problems in her marriage, her sexual relationship with her husband, and her children's behavior and school performance. Whether this was merely friendly advice or constituted treatment by OrRico to Thayer for her domestic problems and depression is a factual determination that a jury must make. We therefore conclude that the designated evidence establishes a genuine issue of material fact as to whether OrRico and Thayer had a therapist-patient relationship, and the trial court erred when it granted OrRico's motion for partial summary judgment.

Reversed.

KIRSCH and MAY, JJ., concur.