Rick NANCE and Areta Nance, Appellants–Plaintiffs,

v.

HOLY CROSS COUNSELING GROUP, et al., Appellee–Defendant.

No. 71A03–0307–CV–271.

Court of Appeals of Indiana.

March 5, 2004.

Rehearing Denied May 12, 2004.

Donald E. Wertheimer, South Bend, IN, Attorney for Appellants.

Dane L. Tubergen, Arthur G. Surguine, Jr., Hunt Suedhoff Kalamaros, LLP, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Rick and Areta Nance ("the Nances"), the biological parents of J.N., appeal the trial court's grant of summary judgment in favor of Holy Cross Counseling Group ("Holy Cross"). In particular, the Nances argue that as J.N.'s therapist, Holy Cross had a duty to prevent his death. Because we find that the relationship between Holy Cross and J.N. had ceased for at least six months at the time of his death; that the manner of his death is unknown; and that public policy would not be served by imposing a duty under these circumstances, we conclude that Holy Cross did not have a duty to protect J.N. Consequently, we affirm.

## Facts and Procedural History

J.N. was born in August 1989. In July 1993, the St. Joseph County Division of Family and Children ("DFC") removed J.N. from the Nance home. The trial court subsequently declared J.N. a child in need of services and placed him with a foster family. He remained with that foster family until November 1996, when J.N. was placed in the foster care of his paternal aunt and her husband. From the time J.N. was removed from his biological parents' home in 1993, the Nances continued to have visitation with J.N.

In December 1994, the DFC referred J.N. to therapy. When J.N. began play therapy with Peggy Rose at Holy Cross, he exhibited signs of a traumatized child, including aggressive play with themes of anger, loss, death, violation, and post-traumatic stress. These themes persisted in his play throughout his therapy, although in 1996, his play also "contained themes of empowerment and more positive resolutions." Appellant's App. p. 22. In January 1997, the trial court suspended visitation between J.N. and his biological parents. While visitation was suspended, J.N. no longer engaged in "post traumatic stress play" and demonstrated remarkable progress, becoming "an active, energetic, happy and thriving young boy." Id. Based on his progress, Rose recommended that J.N. have no further contact with his biological parents. She also found that he no longer needed regular play therapy but should only be seen on an as-needed basis. In the event, however, that J.N. resumed visitation with his biological parents, Rose thought regular counseling sessions should begin again.

In January 1997, there was a report that J.N. had bruises on his back, which both the Mishawaka Police Department and the DFC investigated. Originally, when his visitation supervisor asked J.N. about the bruises, he stated his cousin R.F. had punched and kicked him. Later in the week, when Rose spoke with J.N. about the bruises, he explained that he often "roughhouses" with his cousins and uncle. She also discovered that his teacher saw red marks on his back earlier in the week from the school slide. Based on her own observations of J.N., Rose determined that the marks on his back could have been from "playful roughhousing, typical minor sibling aggression, or simply [J.N.'s] active play on the school playground or elsewhere." Appellant's App. p. 90. In the end, both the police department and the DFC concluded that J.N. was not being physically abused and closed their cases.

In December 1997, J.N. resumed play therapy after being informed that visitation with his biological parents soon would resume. He again engaged in "intense post trauma play" and "repeatedly talked about wanting to die and pretended to die a violent death." Appellant's App. p. 23. He also exhibited behavior problems and a deterioration in functioning at home and school. Consequently, Rose recommended that J.N.'s visitation with his biological parents cease.

In May 1998, the Nances agreed to terminate parental visitation with J.N., and his behavior immediately improved. By the time Rose left her employment with Holy Cross in October 1998, J.N. again had become an "enthusiastic, happy, friendly, outgoing, relaxed and talkative" child. Appellant's App. 23. She witnessed no warning signs that J.N. may be suicidal or depressed. After October 1998, Holy Cross no longer treated J.N.

In March 1999, Darlene Radcliff, an employee of Holy Cross, was asked by the DFC to evaluate J.N. in preparation for a hearing to terminate the Nances' parental rights. She was to determine J.N.'s current level of functioning and develop rec-

ommendations on his clinical needs. After personally observing J.N. in two play sessions and speaking with his foster mother and school officials, Radcliff concluded that J.N. was functioning well in the foster family environment and that no further treatment was necessary at that time. There were no indications that J.N. posed a danger to himself or others. This was the last contact that any Holy Cross employee had with J.N.

Tragically, in September 1999, J.N. was found dead at the home of his foster parents. He had a dog collar around his neck, which was connected to a strap that had been tied to a doorknob. Although the cause of J.N.'s death was strangulation, it is undetermined whether J.N. committed suicide or died from homicide. At the time of his death, J.N. allegedly was at home alone with his cousin R.F.

In September 2001, the Nances filed a complaint against several parties, including Holy Cross, alleging negligence. In March 2002, Holy Cross moved for summary judgment arguing that it had no duty to prevent J.N.'s death. After a hearing, the trial court subsequently granted Holy Cross's motion. This appeal ensued.

### Discussion and Decision

The Nances appeal the grant of summary judgment on behalf of Holy Cross. In particular, the Nances argue that genuine issues of material fact remain as to whether Holy Cross had a common law duty to protect J.N. On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. *Sizemore v. Erie Ins. Exch.,* 789 N.E.2d 1037, 1038 (Ind.Ct.App.2003). A party appealing from an order granting a motion for summary judgment has the burden of persuading the appellate tribunal that the decision to issue the order granting summary judgment was erroneous. *Id.* at 1038–39. We

will sustain the trial court's decision to grant a motion for summary judgment when it is sustainable by any theory or basis found in the record. *Id.* at 1039.

This Court and the trial court are bound to consider only those matters that were designated to the trial court. *Unincorporated Operating Div. of Ind. Newspapers, Inc. v. Trs. of Ind. Univ.,* 787 N.E.2d 893, 900 (Ind.Ct.App.2003), *trans. denied.* The party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *Kostidis v. Gen. Cinema Corp. of Ind.,* 754 N.E.2d 563, 567 (Ind.Ct.App.2001), *trans. denied.* Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Indiana Trial Rule 56, the non-moving party may not rest on its pleadings but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* We must construe all pleadings, affidavits, and testimony liberally and in a light most favorable to the nonmoving party. *Little Beverage Co., Inc. v. DePrez,* 777 N.E.2d 74, 78 (Ind.Ct.App.2002), *trans. denied.*

To recover in negligence, the plaintiff must establish: (1) a duty on the part of the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff; (2) a failure on the part of the defendant to conform its conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the breach. *Ebbinghouse v. FirstFleet, Inc.,* 693 N.E.2d 644, 647 (Ind. Ct.App.1998), *trans. denied.* Whether the law recognizes any obligation on the part of a particular defendant to conform its conduct to a certain standard for the benefit of the plaintiff is a question of law. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.

1991), *reh'g denied.* In order to impose a duty at common law, this Court must balance three factors: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Id.* Absent a duty, there can be no breach and, accordingly, no recovery for the plaintiff in negligence. *Ebbinghouse,* 693 N.E.2d at 647.

■ In deciding whether Holy Cross had a common law duty to protect J.N., we first address the relationship between the parties. The duty owed by a therapist arises from the therapist-patient relationship. *See Thayer v. OrRico,* 792 N.E.2d 919, 924 (Ind.Ct.App.2003), *trans. denied.* At one time, there was a therapist-patient relationship between Holy Cross and J.N.; however, that relationship had ended at least six months before J.N.'s death. In June 1995, Holy Cross employee Rose began treating J.N. His play therapy sessions continued until October 1998 when Rose determined that J.N. no longer needed treatment. In March 1999, Holy Cross employee Radcliff evaluated J.N. in anticipation of a hearing on the termination of the Nances' parental rights. At that time, Radcliff concluded that no further treatment was necessary. After March 1999, no Holy Cross employee treated J.N., and no further treatment was recommended. Thus, even though Holy Cross once had a therapist-patient relationship with J.N., it had ceased at least six months before his death. This factor does not tend to show that Holy Cross owed J.N. any duty at the time of his death.

We also consider the reasonable foreseeability of harm.[1] In this case, it is unclear how J.N. died; it could have been from suicide, from excessive roughhousing, or caused by an intentional act. Because it is undetermined whether J.N. died from suicide or homicide, it is difficult to determine what type of harm Holy Cross should have prevented. When J.N. was last treated by a Holy Cross employee, he was found to no longer be in need of treatment. Even though in December 1997 J.N. displayed signs of violence and expressed a desire to die, by March 1999—when last evaluated by a Holy Cross employee—J.N. indicated no thoughts or behaviors that would suggest he was considering killing himself. In addition, the only evidence Holy Cross had to suggest there was a problem between J.N. and R.F. was a report made in January 1997 where J.N. stated that R.F. had punched and kicked him. When further pressed, J.N. explained that he often roughhoused with his cousin. Because both the police and the DFC found no evidence to support an allegation of physical abuse, they dismissed their cases. No further allegations of physical attacks or abuse were made following January 1997. Thus, we conclude it would have been quite difficult, if not impossible, for Holy Cross to foresee that J.N. might harm himself or that roughhousing may one day lead to his death in September 1999.

Lastly, we consider the public policy concerns implicated by this case. While there may be a strong public policy for holding a therapist responsible for the foreseeable harm that a patient commits, such is not the situation presented by this case. Instead, we are being asked to hold

---

1. The Nances contend that we may not consider specific facts when addressing the foreseeability factor of duty, as originally suggested in *Webb;* however, we question the continuing viability of this approach following our supreme court's decision in *Estate of* *Heck ex rel. Heck v. Stoffer,* 786 N.E.2d 265, 269 (Ind.2003) ("declin[ing] to take a narrow view of *Webb's* foreseeability of harm prong"), *reh'g denied.* In light of *Heck,* we consider specific facts when addressing foreseeability under duty.

Holy Cross accountable for the death of a patient whose relationship with Holy Cross had been terminated for over six months and whose manner of death is unknown. Rather than serving the public good, we believe such a holding would harm it. If liability under the therapist-patient relationship continued well after treatment ended, therapists would be less likely to enter into such a relationship in the first place. Also, because J.N.'s manner of death is unknown, it is unclear what harm Holy Cross was supposed to prevent. We fail to see how the public policy concerns weigh in favor of finding that Holy Cross had a duty to protect J.N. under these circumstances. Balancing all these considerations together, we can only conclude that Holy Cross did not owe a duty to J.N. Consequently, as no duty existed, summary judgment was properly entered in favor of Holy Cross.

Judgment affirmed.

SHARPNACK, J., and MATHIAS, J., concur.