# FOR PUBLICATION



FILED
Sep 25 2013, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JOHN P. NICHOLS**
Anderson & Nichols
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**MICHELE S. BRYANT**
**CRYSTAL SPIVEY WILDEMAN**
Kahn, Dees, Donovan & Kahn, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

STEVEN HARPER and ROSE HARPER )
AS CO-PERSONAL REPRESENTATIVES )
OF THE ESTATE OF STEVEN HARPER, )
DECEASED, )
  )
    Appellants-Plaintiffs-Respondents, )
  )
    vs. ) No. 42A04-1302-MI-95
  )
GERRY HIPPENSTEEL, M.D., )
  )
    Appellee-Defendant-Petitioner. )

APPEAL FROM THE KNOX SUPERIOR COURT
The Honorable W. Timothy Crowley, Judge
Cause No. 42D01-1208-MI-14

**September 25, 2013**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

In October of 2007 and again in April of 2008, Appellee-Defendant-Petitioner Dr. Gerry Hippensteel and Nurse Practitioner Vonetta Vories ("NP Vories") entered into an Indiana Collaborative Practice Agreement for Prescriptive Authority ("CPA") in which Dr. Hippensteel agreed to be available to NP Vories for consultation. Steven Harper, Jr. ("Harper, Jr.") received medical care and treatment from NP Vories at the Primary Care Clinic in Vincennes prior to and during November of 2008. Harper, Jr. died on November 26, 2008, after suffering an acute pulmonary embolism and deep venous thrombosis.

On November 23, 2010, Appellants-Plaintiffs-Respondents Steven Harper, Sr. and Rose Harper (collectively, "the Harpers"), acting as co-personal representatives of the estate of Harper, Jr., filed a Proposed Complaint against Dr. Hippensteel with the Indiana Department of Insurance. In this Proposed Complaint, the Harpers alleged that in 2008, Dr. Hippensteel was negligent in providing medical care and treatment to Harper, Jr., and that Harper, Jr. died as a result of Dr. Hippensteel's negligence. Dr. Hippensteel subsequently filed a Petition for Preliminary Determination of Law/Motion for Summary Judgment in the trial court. In this petition/motion, Dr. Hippensteel sought a determination regarding whether he owed a duty to Harper, Jr. despite the fact that he did not treat Harper, Jr. or participate in any way in Harper, Jr.'s care or treatment. The Harpers, for their part, argued that Dr. Hippensteel owed a duty to Harper, Jr. because he entered into a CPA with the treating nurse practitioner, NP Vories.

Following a hearing, the trial court granted summary judgment in favor of Dr. Hippensteel. On appeal, the Harpers contend that the trial court erred in granting summary judgment in favor of Dr. Hippensteel. Concluding that the trial court properly granted summary judgment in favor of Dr. Hippensteel because he did not owe a duty to Harper, Jr., we affirm.

## FACTS AND PROCEDURAL HISTORY

At all times relevant to this appeal, Dr. Hippensteel was engaged in the private practice of medicine in Vincennes. Also at all times relevant to this appeal, NP Vories worked as a nurse practitioner at the Primary Care Clinic in Vincennes. In October of 2007 and again in April of 2008, Dr. Hippensteel and NP Vories entered into a CPA in which Dr. Hippensteel agreed to be available to NP Vories for consultation. The CPA provided that Dr. Hippensteel would review a random 5% sampling of NP Vories's patient records, including records of the medications prescribed by NP Vories. The CPA explicitly stated that it was not intended to serve as a substitute for NP Vories's independent clinical judgment and did not place increased liability on Dr. Hippensteel for those decisions made by NP Vories.

Harper, Jr. received medical care and treatment from NP Vories at the Primary Care Clinic in Vincennes prior to and during November of 2008. Harper, Jr. died on November 26, 2008, after suffering an acute pulmonary embolism and deep venous thrombosis.

On November 23, 2010, the Harpers, acting as co-personal representatives of the Estate of Harper, Jr., filed a Proposed Complaint against Dr. Hippensteel with the Indiana Department of Insurance. In this Proposed Complaint, the Harpers alleged that in 2008, Dr.

3

Hippensteel was negligent in providing medical care and treatment to Harper, Jr., and that Harper, Jr. died as a result of Dr. Hippensteel's negligence. The medical review panel of the Indiana Department of Insurance has yet to issue an opinion relating to any alleged negligence on behalf of Dr. Hippensteel.

Dr. Hippensteel subsequently filed a Petition for Preliminary Determination of Law/Motion for Summary Judgment in the trial court. In this petition/motion, Dr. Hippensteel sought a determination regarding whether he owed a duty to Harper, Jr. despite the fact that he did not treat Harper, Jr. or participate in any way in Harper, Jr.'s care or treatment. The Harpers, for their part, argued that Dr. Hippensteel owed a duty to Harper, Jr. because he entered into a CPA with the treating nurse practitioner, NP Vories. Following a hearing, the trial court granted summary judgment in favor of Dr. Hippensteel, determining that Dr. Hippensteel did not have a physician-patient relationship with Harper, Jr., and did not owe a duty to Harper, Jr. "solely because [he] had executed a [CPA]" with NP Vories. Appellants' App. p. 5. This appeal follows.

## DISCUSSION AND DECISION

Initially, we note that in medical malpractice cases such as the case at bar, a trial court has only limited jurisdiction prior to the submission of an expert opinion by a medical review panel. *Dixon v. Siwy*, 661 N.E.2d 600, 605 (Ind. Ct. App. 1996). This limited jurisdiction includes the jurisdiction to rule upon issues not preserved for the medical review panel[1] which can be preliminary determined under a Trial Rule 12 motion to dismiss or a Trial Rule

---

[1] Issues preserved for the medical review panel include those pertaining to whether the defendant failed to meet the requisite standard of care in treating the patient. *See Dixon*, 661 N.E.2d at 605.

4

56 motion for summary judgment. *Id.* at 606. Where, as here, the trial court is asked to determine whether, given a seemingly undisputed set of facts, a physician-patient relationship existed, the question is a legal question for the court and is not reserved for the medical review panel. *Id.* at 607.

## I. Whether the Trial Court Erred in Granting Summary Judgment in Favor of Dr. Hippensteel

The Harpers contend that the trial court erred in granting summary judgment in favor of Dr. Hippensteel because Dr. Hippensteel breached a duty owed to Harper, Jr. In making this claim, the Harpers concede that Dr. Hippensteel did not provide treatment to or participate in the care or treatment of Harper, Jr. The Harpers argue, however, that Dr. Hippensteel nevertheless engaged in a physician-patient relationship with Harper, Jr. because he entered into a CPA with NP Vories. Dr. Hippensteel argues on appeal that he had no duty to Harper, Jr. because he did not participate in Harper, Jr.'s care or treatment, and also because the CPA that he entered into with NP Vories did not create a physician-patient relationship between himself and any of NP Vories's patients.

### A. Standard of Review

Summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In reviewing a motion for summary judgment, this Court stands in the shoes of the trial court. This Court must liberally construe all designated evidentiary matter in favor of the non-moving party and resolve any doubt against the moving party. Even if it appears that the non-moving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences. The existence of a genuine issue of material fact shall not be ground for reversal on appeal unless such fact was designated to the trial court and is included in the record.

5

*Stryczek v. Methodist Hosps., Inc.*, 656 N.E.2d 553, 554 (Ind. Ct. App. 1995).

## B. Whether Dr. Hippensteel Owed a Duty to Harper Jr.

The Harpers' claims against Dr. Hippensteel are premised on a theory of negligence. In order to recover under a theory of negligence, a plaintiff must establish three elements:

> (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach.

*Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). In the instant appeal, we need consider only the first element relating to the existence of a duty. The question of whether the defendant owed a duty to another is a question of law. *See id.*

## 1. Physician-Patient Relationship

In medical malpractice cases, the duty owed by a physician arises from the physician-patient relationship.

> Thus, a physician-patient relationship is a legal prerequisite to a medical malpractice cause of action. *See* [*Dixon*, 661 N.E.2d at 607.] Additionally, that duty arises from the contractual relationship entered into between the doctor and patient. *Walker v. Rinck*, 604 N.E.2d 591, 594 (Ind. 1992). Generally, where a doctor does not treat, see, or in any way participate in the care or diagnosis of the plaintiff-patient … a doctor-patient relationship will not be found to exist. *Dixon*, 661 N.E.2d at 607. As noted in *Dixon*, our research has revealed "no authority for the proposition that a physician-patient relationship may be established without the physician performing some affirmative act with regard to the patient and without the physician's knowledge." *Id.* In the absence of a physician-patient relationship, there can be no liability on the part of the defendant physician, and the entry of summary judgment is appropriate. *Id.*

*Miller v. Martig*, 754 N.E.2d 41, 46 (Ind. Ct. App. 2001).

With respect to Harper, Jr., Dr. Hippensteel averred that he never saw Harper, Jr. as a patient, and that he did not ever speak with NP Vories concerning Harper, Jr. Dr. Hippensteel did not review any of Harper, Jr.'s medical records prior to the initiation of the instant action. Dr. Hippensteel averred that he did not make any recommendations to Harper, Jr. or any of his health care providers regarding his condition or any course of treatment. Dr. Hippensteel also averred that he did not participate in any course of Harper, Jr.'s treatment and had no involvement whatsoever with his medical care. Dr. Hippensteel further averred that he "had never heard of [Harper, Jr.] until two years after he died when [Dr. Hippensteel] was named as a Defendant in a Proposed Complaint filed with the Indiana Department of Insurance by the Personal Representatives of his Estate." Appellants' App. p. 15. The Harpers do not appear to dispute any of these facts. Moreover, NP Vories did not work for Dr. Hippensteel, but rather worked for the Primary Care Clinic which appears to be owned and operated by Good Samaritan Hospital.

Upon review, we conclude that these seemingly undisputed facts demonstrate that, in the traditional sense, Dr. Hippensteel was not engaged in a physician-patient relationship with Harper Jr., as he did not perform any affirmative act with regard to Harper, Jr. As such, we further conclude that, generally, Dr. Hippensteel did not owe a duty to Harper, Jr. *See Miller*, 754 N.E.2d at 46; *Dixon*, 661 N.E.2d at 607. However, we must next turn our attention to the question of whether a physician-patient relationship exists solely because the physician entered into a CPA with the treating nurse practitioner.

### a. Overview of the Practice of Advanced Practice Nurses in Indiana

7

In determining whether Dr. Hippensteel could be found to have engaged in a physician-patient relationship with Harper, Jr. by way of the CPA entered into between Dr. Hippensteel and NP Vories, we find it helpful to provide an overview of Indiana law relating to the practice of advanced practice nurses and nurse practitioners in Indiana.

> "Advanced practice nurse" means a registered nurse holding a current license in Indiana who:
> (1) has obtained additional knowledge and skill through a formal, organized program of study and clinical experience, or its equivalent, as determined by the board;
> (2) functions in an expanded role of nursing at a specialized level through the application of advanced knowledge and skills to provide healthcare to individuals, families, or groups in a variety of settings, including, but not limited to:
>> (A) homes;
>> (B) institutions;
>> (C) offices;
>> (D) industries;
>> (E) schools;
>> (F) community agencies;
>> (G) private practice;
>> (H) hospital outpatient clinics; and
>> (I) health maintenance organizations; and
> (3) makes independent decisions about the nursing needs of clients.

848 Ind. Admin. Code 4-1-3(a).

> The three (3) categories of advanced practice nurses as defined in IC 25-23-1-1[2] are as follows:

---

[2] Indiana Code section 25-23-1-1(b) provides as follows:
"Advanced practice nurse" means:
> (1) a nurse practitioner;
> (2) a certified nurse midwife; or
> (3) a clinical nurse specialist;
who is a registered nurse qualified to practice nursing in a specialty role based upon the additional knowledge and skill gained through a formal organized program of study and clinical experience, or the equivalent as determined by the board, which does not limit but extends or expands the function of the nurse which may be initiated by the client or provider in settings that shall include hospital outpatient clinics and health maintenance organizations.

8

(1) Nurse practitioner as defined in section 4 of this rule (848 IAC 4-1-4).
(2) Certified nurse-midwife as defined in 848 IAC 3-1.
(3) Clinical nurse specialist as defined in section 5 of this rule (848 IAC 4-1-5).

848 Ind. Admin. Code 4-1-3(b).

"Nurse practitioner" means an advanced practice nurse who provides advanced levels of nursing client care in a specialty role, who meets the requirements of an advanced practice nurse as outlined in section 3 of this rule (848 IAC 4-1-3), and who has completed any of the following:

(1) A graduate program offered by a college or university accredited by the Commission on Recognition of Postsecondary Accreditation which prepares the registered nurse to practice as a nurse practitioner and meets the requirements of section 6 of this rule (848 IAC 4-1-6).

(2) A certificate program offered by a college or university accredited by the Commission on Recognition of Postsecondary Accreditation which prepares the registered nurse to practice as a nurse practitioner and meets the requirements of section 6 of this rule (848 IAC 4-1-6). Nurse practitioners who complete a certificate program must be certified and maintain certification as a nurse practitioner by a national organization which requires a national certifying examination.

(3) Prior to the promulgation of this article (848 IAC 4), the following:

(A) A formal organized program of study and clinical experience which prepares the registered nurse to practice as a nurse practitioner.

(B) The required program of study at a time when there was no credentialing or certification process available in the specialty area of the program of study.

848 Ind. Admin. Code 4-1-4(a). "'NP' means nurse practitioner and are the designated authorized initials to be used by the nurse practitioner." 848 Ind. Admin. Code 4-1-4(b).

A nurse practitioner shall perform as an independent and interdependent member of a health team.[3] The following are standards for each nurse practitioner:

---

[3] "'Health team' means a group of health care providers which may, in addition to health care practitioners, include the patient/client, family, and any significant others." 848 Ind. Admin. Code 2-1-3.

9

(1) Assess clients by using advanced knowledge and skills to:

    (A) identify abnormal conditions;

    (B) diagnose health problems;

    (C) develop and implement nursing treatment plans;

    (D) evaluate patient outcomes; and

    (E) collaborate with or refer to a practitioner, as defined in IC 25-23-1-19.4, in managing the plan of care.

(2) Use advanced knowledge and skills in teaching and guiding clients and other health team members.

(3) Use appropriate critical thinking skills to make independent decisions, commensurate with the autonomy, authority, and responsibility of a nurse practitioner.

(4) Function within the legal boundaries of their advanced practice area and shall have and utilize knowledge of the statutes and rules governing their advanced practice area, including the following:

    (A) State and federal drug laws and regulations.

    (B) State and federal confidentiality laws and regulations.

    (C) State and federal medical records access laws.

(5) Consult and collaborate with other members of the health team as appropriate to provide reasonable client care, both acute and ongoing.

(6) Recognize the limits of individual knowledge and experience, and consult with or refer clients to other health care providers as appropriate.

(7) Retain professional accountability for any delegated intervention, and delegate interventions only as authorized by IC 25-23-1 and this title (848 IAC).

(8) Maintain current knowledge and skills in the nurse practitioner area.

(9) Conduct an assessment of clients and families which may include health history, family history, physical examination, and evaluation of health risk factors.

(10) Assess normal and abnormal findings obtained from the history, physical examination, and laboratory results.

(11) Evaluate clients and families regarding development, coping ability, and emotional and social well-being.

(12) Plan, implement, and evaluate care.

(13) Develop individualized teaching plans with each client based on health needs.

(14) Counsel individuals, families, and groups about health and illness and promote attention to wellness.

(15) Participate in periodic or joint evaluations of service rendered, including, but not limited to, the following:

    (A) Chart reviews.

    (B) Client evaluations.

(C) Outcome statistics.
(16) Conduct and apply research findings appropriate to the area of practice.
(17) Participate, when appropriate, in the joint review of the plan of care.

848 Ind. Admin. Code 4-2-1.

An advanced practice nurse, including a nurse practitioner, may be authorized to prescribe legend drugs, including controlled substances, if the advanced practice nurse completes a number of requirements. 848 Ind. Admin. Code 5-1-1. One of these requirements is that the advanced practice nurse submits proof of collaboration with a licensed practitioner in the form of a written practice agreement that sets forth the manner in which the advanced practice nurse and licensed practitioner will cooperate, coordinate, and consult with each other in the provision of health care to patients. 848 Ind. Admin. Code 5-1-1(7). "Practice agreements shall be in writing and shall also set forth provisions for the type of collaboration between the advanced practice nurse and the licensed practitioner and the reasonable and timely review by the licensed practitioner of the prescribing practices of the advanced practice nurse." 848 Ind. Admin. Code 5-1-1(7).

Specifically, the written practice agreement shall contain at least the following information:
(A) Complete names, home and business addresses, zip codes, and telephone numbers of the licensed practitioner and the advanced practice nurse.
(B) A list of all other offices or locations besides those listed in clause (A) where the licensed practitioner authorized the advanced practice nurse to prescribe.
(C) All specialty or board certifications of the licensed practitioner and the advanced practice nurse.
(D) The specific manner of collaboration between the licensed practitioner and the advanced practice nurse, including how the licensed practitioner and the advanced practice nurse will:
(i) work together;

11

(ii) share practice trends and responsibilities;

(iii) maintain geographic proximity; and

(iv) provide coverage during absence, incapacity, infirmity, or emergency by the licensed practitioner.

(E) A description of what limitation, if any, the licensed practitioner has placed on the advanced practice nurse's prescriptive authority.

(F) A description of the time and manner of the licensed practitioner's review of the advanced practice nurse's prescribing practices. The description shall include provisions that the advanced practice nurse must submit documentation of the advanced practice nurse's prescribing practices to the licensed practitioner within seven (7) days. Documentation of prescribing practices shall include, but not be limited to, at least a five percent (5%) random sampling of the charts and medications prescribed for patients.

(G) A list of all other written practice agreements of the licensed practitioner and the advanced practice nurse.

(H) The duration of the written practice agreement between the licensed practitioner and the advanced practice nurse.

848 Ind. Admin. Code 5-1-1(7).

## b. Whether Dr. Hippensteel Had a Physician-Patient Relationship with Harper, Jr. by Means of the CPA He Entered into with NP Vories

In the instant matter, Dr. Hippensteel agreed to enter into a CPA with NP Vories. The CPA read, in relevant part, as follows:

Manner of Collaboration:

a. The [advanced practice nurse] shall be permitted to prescribe legend drugs appropriate for conditions, which the [advanced practice nurse] may treat pursuant to the [advanced practice nurse]'s scope of practice.

b. The [advanced practice nurse] will provide professional services in collaboration with above said physician.

c. The [advanced practice nurse] will work in collaboration and consultation with above said physician as appropriate to provide reasonable patient care. *The [advanced practice nurse] may provide the professional services, including but not limited to the following: assess clients by using advanced knowledge and skills; diagnose health problems; develop and implement treatment plans; make independent decisions commensurate with autonomy, authority and responsibility of a nurse*

12

> *practitioner; evaluate clients, plan, implement, and evaluate care; and develop teaching plans.*
>
> d. This Agreement shall not be construed as limiting, in any way or to any extent, the scope of practice authority provided to the [advanced practice nurse] pursuant to Ind. Admin. Codes.
>
> e. The [advanced practice nurse] will practice within the same geographic area as the physician and physician shall be available for consultation by telephone.
>
> f. In the event that physician is absent due to incapacity, vacation, infirmity, emergency, etc., physician shall arrange for another qualified physician to collaborate with the [advanced practice nurse] during his absence.
>
> Limitations: *Physician has placed no limitations on the [advanced practice nurse] prescriptive authority.*
>
> Physician Review: The [advanced practice nurse] will submit documentation of her prescribing practice to physician every seven days. Such documentation shall include, but not be limited to, at least a five (5) percent random sampling of the records and medications prescribed for patients.
>
> **\*\*\*\***
>
> Independent Judgment: This Agreement is not intended to serve as a substitute for the independent judgment of the [advanced practice nurse] based on the specific needs of the patient, *and this Agreement does not place increased liability on the physician for those decisions made by the [advanced practice nurse].*

Appellants' App. pp. 21-22 (emphases added).

Our review of the CPA indicates that pursuant to the terms of the CPA, Dr. Hippensteel agreed to be available to NP Vories by telephone for consultation, if needed, and NP Vories agreed to submit a random 5% sample of her treatment files to Dr. Hippensteel for review on a weekly basis. NP Vories had the authority to assess clients, diagnose health problems, develop and implement treatment plans, and evaluate care, and the CPA placed no limits on NP Vories's prescriptive authority. The CPA indicates that it does not serve as a substitute for NP Vories's independent judgment based on the specific needs of her patients.

13

Importantly, the CPA also explicitly states that the CPA does not place increased liability on Dr. Hippensteel for decisions made by NP Vories.

Because the CPA explicitly states that its terms do not place any increased liability on Dr. Hippensteel for decisions made by NP Vories, and indicates that NP Vories had the independent authority to treat patients as she saw fit, we cannot conclude that Dr. Hippensteel entered into a physician-patient relationship with each of NP Vories's patients merely because he entered into a CPA with NP Vories. Accordingly, because the CPA did not increase Dr. Hippensteel's liability, Dr. Hippensteel could only be found to have entered into a physician-patient relationship and, as a result, acquired a duty to NP Vories's patients, if he performed any affirmative act with regard to the patient. *See Miller*, 754 N.E.2d at 46; *Dixon*, 661 N.E.2d at 607. Again, the record in the instant matter indicates that Dr. Hippensteel did not do so with regard to Harper, Jr.

In sum, we conclude that Dr. Hippensteel did not owe a duty to Harper, Jr. because he did not, at any time, enter into a physician-patient relationship with Harper, Jr. As such, we conclude that Dr. Hippensteel was entitled to summary judgment.

The judgment of the trial court is affirmed.

BAILEY, J, and MAY, J., concur.

14