# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**J. KEVIN KING**
**PETER CAMPBELL KING**
Cline, King & King, P.C.
Columbus, Indiana

**GEORGE HOFFMAN, III**
Hoffman & Newcomb
Franklin, Indiana

ATTORNEYS FOR APPELLEES:

**CHRISTOPHER L. RIEGLER**
**KIMBERLY A. EMIL**
Hall, Render, Killian, Heath & Lyman, P.C.
Indianapolis, Indiana



FILED

Jul 21 2014, 10:01 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

JAMES GILES, Individually and as Executor
Of the Estate of RUTH GILES, deceased.           )
)
)
Appellant/Plaintiff,           )
)
vs.           )           No. 03A01-1306-CT-257
)
ANONYMOUS PHYSICIAN I,           )
ANONYMOUS CORPORATION I,           )
ANONYMOUS HOSPITAL I,           )
ANONYMOUS PHYSICIAN II,           )
ANONYMOUS CORPORATION II,           )
ANONYMOUS PHYSICIAN III,           )
ANONYMOUS CORPORATION III,           )
ANONYMOUS PHYSICIAN IV,           )
ANONYMOUS CORPORATION IV,           )
ANONYMOUS PHYSICIAN V,           )
ANONYMOUS CORPORATION V.           )
)
Appellees/Defendants.           )

APPEAL FROM THE BARTHOLOMEW SUPERIOR COURT
The Honorable Kathleen Tighe Coriden, Judge
Cause No. 03D02-1207-CT-3827

**July 21, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**


STATEMENT OF THE CASE

This appeal involves a preliminary determination in a medical malpractice case filed in the county court while the case was pending before the Indiana Department of Insurance ("IDOI"). Anonymous Physician I ("Hospitalist")[1] and Anonymous Corporation I ("Medical Corporation")—after being sued by James Giles ("Giles"), individually and as executor of the estate of Ruth Giles, deceased ("Ruth")—moved for summary judgment on the basis that Hospitalist owed no duty to Ruth because he did not treat her or have a physician-patient relationship with her. Giles now appeals the trial court's order granting summary judgment to Hospitalist and Medical Corporation.[2]

We affirm.

---

[1] A hospitalist is a "physician who specializes in the practice of hospital medicine[,]" which is a "medical specialty dedicated to the delivery of comprehensive medical care to hospitalized patients." (App. 243).

[2] There are other anonymous parties named as defendants in this medical malpractice action. Although, pursuant to Indiana Appellate Rule 17, they are considered parties on appeal, they are not participating in this appeal as summary judgment was filed by and entered in favor of Hospitalist and Medical Corporation only. *See* Ind. Appellate Rule 17(A) (providing that "[a] party of record in the trial court . . . shall be a party on appeal").

INDIANA CODE § 34-18-8-7 provides that a medical malpractice "claimant may commence an action in court for malpractice at the same time the claimant's proposed complaint is being considered by a medical review panel" in the IDOI as long as the complaint filed in the trial court does "not contain any information that would allow a third party to identify the defendant[.]" In his summary judgment motion, Hospitalist referred to himself and Medical Corporation by name and agreed to let Giles do the same. The other defendants allowed Giles to refer to them by their areas of specialty. Thus, during the summary judgment proceedings, the parties and the trial court referred to Hospitalist and Medical Corporation by name. On appeal, the parties do the same. We, however, will refer to all parties generically by their areas of specialty.

## ISSUE

Whether the trial court erred by granting summary judgment to Hospitalist based on a determination that there was no physician-patient relationship and, thus, no duty.

## FACTS

The facts most favorable to Giles, the non-moving party in this summary judgment proceeding, reveal that on August 1, 2010, fifty-seven-year-old Ruth fell and broke her nose. On August 4, 2010, she consulted Anonymous Physician IV ("ENT Surgeon") about her nose. ENT Surgeon diagnosed Ruth with a deviated nasal fracture and recommended that she have a closed nasal reduction surgery.

On August 11, 2010, Ruth went to Anonymous Hospital ("Hospital") to have the outpatient nasal surgery. The surgery lasted ten minutes, starting at 12:29 p.m. and ending at 12:39 p.m. Anonymous Physician II ("Anesthesiologist") stopped Ruth's anesthesia at 12:47 p.m. The surgery was completed without any major complications.

After the surgery, Ruth was taken to the hospital's recovery room or post anesthesia care unit ("PACU"). While in the PACU, Ruth had individual nursing care from a nurse ("PACU Nurse") and was under the general care of Anesthesiologist, who was charged with taking care of issues with Ruth's heart, lungs, blood pressure, and recovery from sedation.

Upon arriving in the PACU, Ruth had a lowered level of oxygen saturation. Later, her blood pressure began to lower, and she complained to PACU Nurse of chest pain. Anesthesiologist ordered an EKG, which showed a "normal rhythmic beat" and did not

3

show any sign of "ischemia." (App. 130).[3] Ruth's blood pressure remained low, and Anesthesiologist ordered the administration of increased fluids and ephedrine to help increase her blood pressure. Due to Ruth's continued low oxygen saturation levels, Anesthesiologist also gave an order for Ruth, who had a history of asthma, to have an albuterol breathing treatment.

Ruth's condition did not substantially improve. Around 2:20 p.m., PACU Nurse updated ENT Surgeon, who was the attending physician, about Ruth's condition. ENT Surgeon told PACU Nurse that he would have a hospitalist see Ruth. Thereafter, ENT Surgeon spoke by phone with Hospitalist, who was the on-call hospitalist. ENT Surgeon told Hospitalist that he had a patient who had had a closed nasal reduction surgery and was having low oxygen saturations, and he asked Hospitalist to see Ruth in the PACU.

Hospitalist was a hospitalist physician and employed by Medical Corporation, which is a hospitalist group. Hospitalist and his hospitalist group do not have a traditional office; instead, the hospital is their practice site. Hospitalist's hospitalist group provided hospitalist care to only those hospital patients whose primary care physician or family doctor had previously agreed to let the hospitalist group care for the family doctor's patients while these patients were in the hospital. In other words, once a family

---

[3] Ischemia is a "deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease)." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/ischemia (last visited June 30, 2014). *See also* WebMD Dictionary, http://www.webmd.com/a-to-z-guides/ischemia-topic-overview (last visited June 30, 2014) ("Ischemia is the medical term for what happens when your heart muscle doesn't get enough oxygen. Ischemia usually happens because of a shortage of blood and oxygen to the heart muscle.").

4

doctor agreed to pass or defer the hospital care of his/her patients to the hospitalist program, the family doctor would defer hospital care of *all* his/her patients to the hospitalist group and would no longer go to the hospital to see his or her patients while they were in the hospital. At the time of Ruth's surgery, Ruth's primary care physician, Anonymous Physician III ("Family Doctor"), had not deferred hospital care of his patients, including Ruth, to the hospitalist group.

At 2:35 p.m., Hospitalist went into the PACU. Once he checked Ruth's chart and saw that her Family Doctor had not authorized the hospitalist group to treat the Family Doctor's patients, he told Ruth that he could not treat her because she was not a hospitalist patient. The PACU Nurse's notes indicate:

> NOTES: [Hospitalist] AT BEDSIDE TO SEE PT UPON QUESTIONING PT [Hospitalist] STATES HE CAN NOT SEE PT R/T [related to] PRIMARY DR NOT CONTRACTING WITH HOSPITALISTS. Paged [ENT Surgeon] AND HE RETURNED PAGE UPDATED ON CONDITION, AND HOSPITALIST UNABLE TO TREAT PT

(App. 241).[4] Hospitalist did not examine or treat Ruth and did not submit a billing charge for Ruth. Hospitalist then informed ENT Surgeon that he would not be able to see Ruth "based on the protocol" because Ruth's Family Doctor wanted to see his own patients at the hospital and did not want the hospitalists to see them. (App. 56). Hospitalist told ENT Surgeon that he would need to contact Family Doctor.

ENT Surgeon then called Family Doctor, informed him that Ruth was having some issues with oxygen saturation and blood pressure, and requested him to manage

---

[4] Both parties on appeal have each filed an appellate appendix. We will refer to Giles's Appendix as "App." and Hospitalist's Appendix as "Appellee's App." Additionally, we note that the content of Giles's Appendix did not fully comply with our appellate rules and direct Giles's counsel to Indiana Appellate Rule 50(A)(2).

these issues. Family Doctor, who was in his office, stated that he would go see Ruth after seeing his office appointments.

In the meantime, PACU Nurse updated Anesthesiologist on Ruth's condition, and he went to the PACU to check on her. At 3:30 p.m., Anesthesiologist told the PACU Nurse that Ruth was ready to be admitted to the hospital when a bed was ready. Anesthesiologist thought Ruth needed to be admitted based on her low blood pressure and low oxygen saturation, but he apparently did not have admitting privileges.

At 4:00 p.m., Family Doctor spoke with PACU Nurse and informed her that he was not comfortable giving telephone orders. At 4:15 p.m., PACU Nurse called ENT Surgeon and informed him of the situation with Family Doctor. Thereafter, ENT Surgeon called in an order for Ruth to be admitted to the hospital.

Later that day, when Family Doctor went to the hospital to see Ruth, he transferred her to the ICU. Ruth tested positive for influenza, and her condition deteriorated. Ruth died on August 14, 2010. Ruth's certificate of death indicates that her cause of death was cardiopulmonary arrest due to respiratory failure and pneumonia.

Approximately two years later, on July 27, 2012, Giles filed a proposed complaint with the IDOI and contemporaneously filed a complaint in the Bartholomew Superior Court. In both complaints, Giles generally alleged that the hospital, various doctors (including Hospitalist), and these doctors' corresponding medical corporations had, "rendered care" to Ruth "and as such, . . . owed [her] a duty to render competent and timely care[.]" (Appellee's App. 14, 18). Giles's two complaints also generally alleged that the hospital, doctors, and medical corporations had "breached their duty and rendered

6

medical treatment below the standard of care and, as such, were negligent" and that their "negligence was the responsible cause of Ruth Giles['s] injuries, harms, damages, and death[.]" (Appellee's App. 14, 18).

On August 22, 2012, Hospitalist and his Medical Corporation filed a motion for summary judgment, seeking a preliminary determination of law on the issue of whether Hospitalist owed a duty to Ruth. In the summary judgment motion, Hospitalist argued that he did not owe a legal duty to Ruth because he did not treat her and did not have a physician-patient relationship with her. As part of his designated evidence, Hospitalist submitted an affidavit, in which he averred that he "did not participate in any course of [Ruth's] treatment[,]" had informed Ruth that he "could not treat her and would not participate in her care[,]" and had "expressly declined" to enter a physician-patient relationship with Ruth. (Appellee's App. 26-27). Hospitalist also submitted an affidavit from his billing manager to show that he did not submit any billing charges related to Ruth. Hospitalist argued that he was entitled to summary judgment because Ruth's claim against him was "barred under the clear precedent" of *Miller v. Martig*, 754 N.E.2d 41, 46 (Ind. Ct. App. 2001), which held that "[g]enerally, where a doctor does not treat, see, or in any way participate in the care or diagnosis of the plaintiff-patient prior to or during surgery, a doctor-patient relationship will not be found to exist."

On February 1, 2013, Giles responded to Hospitalist's motion for summary judgment. Giles did not dispute that Hospitalist did not treat Ruth. Instead, Giles argued that the trial court should impose a duty on Hospitalist. Giles designated a portion of the Hospital's rules and regulations regarding medical consultations and argued that these

7

rules required Hospitalist to provide a consult. Giles argued that Hospitalist had a duty to treat Ruth because ENT Surgeon had requested a consultation. Giles also argued that the *Miller* case, upon which Hospitalist relied, was distinguishable. Giles argued that Ruth's case involved the need to determine an issue that the *Miller* court did not decide, specifically, the issue of when and if a physician-patient relationship could be established for an on-call physician absent a contractual relationship between the physician and patient. Giles argued that Ruth had a physician-patient relationship as a result of Hospitalist's status as the on-call hospitalist. Giles also designated evidence that Family Doctor had signed, in May 2008, a letter of authorization, in which Family Doctor "agree[d] to assign to the hospitalist program the care of: Patients who present for admission when [Family Doctor was] the responsible emergency department unassigned call (ER backup) physician[,]" and Family Doctor authorized the "Hospital's Emergency Department staff to directly contact the hospitalist program for the patients identified above." (App. 39). However, on the date that Ruth had her surgery, Family Doctor was not the emergency department unassigned call (ER backup) physician, and Ruth was not an unassigned patient as she was a patient of Family Doctor.[5]

Thereafter, Hospitalist filed a reply in support of his summary judgment motion and supplemental designated evidence. Hospitalist argued that Giles had not shown a

---

[5] Giles also argued that the trial court should determine whether a duty could be found to exist under the three factors in *Webb v. Jarvis* (relationship between the parties; reasonable foreseeability of harm; and public policy concerns). *See Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), *reh'g denied*. Giles argued that the balancing of these three factors favored the imposition of a duty on Hospitalist despite a lack of a physician-patient relationship.

genuine issue of material fact, and he asserted that the trial court should reject Giles's invitation to create a duty where none existed.[6]

On March 22, 2013, the trial court issued the following order granting Hospitalist and Medical Corporation's motion for summary judgment:

> The court finds no genuine issue of fact exists as to whether a patient-physician relationship existed between [Hospitalist and Ruth]. The patient-physician relationship is a consensual one where the patient knowingly seeks the physician's assistance and the physician knowingly accepts the potential physician [sic]. Indiana law has consistently required that the physician perform some type of affirmative action on the patient's behalf before a patient-physician relationship has been established. [Hospitalist] made no such affirmative act on behalf of the decedent [Ruth]. [Giles] has failed to provide any legal authority to suggest the doctor had a duty to act on behalf of someone not his patient. In the absence of a patient-physician relationship this [sic] is no liability on the part of the physician.

(Appellee's App. 187). On May 14, 2013, the trial court entered final judgment pursuant to Trial Rule 54(B). Giles now appeals.

## DECISION

Giles argues that the trial court erred by granting Hospitalist's motion for summary judgment on Giles's medical malpractice claim.

When reviewing a trial court's order granting summary judgment, we apply the same standard as that used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where the designated evidence

---

[6] Hospitalist also argued that *Webb* was not applicable to the facts of this case because the Indiana Supreme Court had clarified that the application of the analysis in *Webb* was reserved for unique cases where the issue of duty was not articulated under existing case law. Hospitalist asserted that *Webb* was not relevant because that case involved a determination of whether a physician's already established duty to a patient could be extended to third party and not in a case such as this where first party liability was at issue and where the applicable duty at issue was already articulated.

9

shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012). If the moving party meets this burden, then the non-moving party must designate evidence demonstrating a genuine issue of material fact. *Id.* "[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." T.R. 56(E). When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Dible v. City of Lafayette*, 713 N.E.2d 269, 272 (Ind. 1999). A trial court's grant of summary judgment is "'clothed with a presumption of validity,'" and an appellant has the burden of demonstrating that the grant of summary judgment was erroneous. *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009) (quoting *Rosi v. Bus. Furniture Corp.*, 615 N.E.2d 431, 434 (Ind. 1993)).

Before addressing the parties' arguments, we note that in a medical malpractice action such as the one before us on appeal—where a medical review panel has yet to issue a written opinion—a trial court has limited jurisdiction. *Harper v. Hippensteel*, 994 N.E.2d 1233, 1236 (Ind. Ct. App. 2013) (citing *Dixon v. Siwy*, 661 N.E.2d 600, 605 (Ind. Ct. App. 1996)). "This limited jurisdiction includes the jurisdiction to rule upon issues

10

not preserved for the medical review panel[] [that] can be preliminarily determined under . . . a Trial Rule 56 motion for summary judgment." *Id.* *See also* IND. CODE § 34-18-11-1 (providing that a trial court may "preliminarily determine an affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana Rules of Procedure" and that is not an issue reserved for written opinion by a medical review panel). [7]

"Medical malpractice cases are no different from other kinds of negligence actions regarding that which must be proven." *Bader v. Johnson*, 732 N.E.2d 1212, 1216-17 (Ind. 2000). Specifically, a plaintiff in a medical malpractice action must prove: (1) duty owed to the plaintiff by the defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the defendant's breach of duty. *Id.* at 1217. This case involves only the first element relating to the existence of a duty; more specifically, this case involves the question of whether Hospitalist owed a duty to Ruth. The question of whether a duty exists is a question of law and appropriate for summary judgment. *Harper*, 994 N.E.2d at 1237. *See also Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004) ("Generally, whether a duty exists is a question of law for the court to decide."). *But see Kopczynski v. Barger*, 887 N.E.2d 928, 931 (Ind. 2008) ("[T]he existence of a duty is ordinarily a question of law for the court to decide, but it may turn on factual issues that must be resolved by the trier of

---

[7] "Issues preserved for the medical review panel include those pertaining to whether the defendant failed to meet the requisite standard of care in treating the patient." *Harper*, 994 N.E.2d at 1236 n.1 (citing *Dixon,* 661 N.E.2d at 605).

11

fact."). "Absent a duty there can be no negligence or liability based upon the breach." *Kroger Co. v. Plonski*, 930 N.E.2d 1, 6 (Ind. 2010).

In a medical malpractice case, "[t]he duty of a physician to a patient arises from the contractual relationship entered into between the two of them." *Walker v. Rinck*, 604 N.E.2d 591, 594 (Ind. 1992) (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991), *reh'g denied*). We have previously discussed the interaction between issue of duty and the physician-patient relationship as follows:

> Our supreme court has observed that the duty owed by a physician arises from the physician-patient relationship. Thus, a physician-patient relationship is a legal prerequisite to a medical malpractice cause of action. *See Dixon v. Siwy*, 661 N.E.2d 600, 607 (Ind. Ct. App. 1996). Additionally, that duty arises from the contractual relationship entered into between the doctor and patient. *Walker v. Rinck*, 604 N.E.2d 591, 594 (Ind. 1992). Generally, where a doctor does not treat, see, or in any way participate in the care or diagnosis of the plaintiff-patient prior to or during surgery, a doctor-patient relationship will not be found to exist. *Dixon*, 661 N.E.2d at 607. As noted in *Dixon*, our research has revealed "no authority for the proposition that a physician-patient relationship may be established without the physician performing some affirmative act with regard to the patient and without the physician's knowledge." *Id.* In the absence of a physician-patient relationship, there can be no liability on the part of the defendant physician, and the entry of summary judgment is appropriate. *Id.*

*Miller v. Martig*, 754 N.E.2d 41, 46 (Ind. Ct. App. 2001). Thus, our caselaw is clear that a physician who does not treat a patient or perform some affirmative act regarding the patient has no physician-patient relationship and thus owes no duty to that patient. *See id. See also Harper*, 994 N.E.2d at 1238; *Dixon*, 661 N.E.2d at 607.

Here, Giles's complaint alleged that Hospitalist "rendered care" to Ruth and that he breached his duty of care when he "rendered medical treatment below the standard of care[.]" (Appellee's App. 18). However, it is undisputed that Hospitalist did not provide

12

any treatment to Ruth and did not perform any affirmative act toward her. When Hospitalist moved for summary judgment, he designated evidence to show that he did not treat Ruth and did not have a physician-patient relationship with her. In Hospitalist's affidavit, he explained that he was not able to see or treat Ruth as a patient because she was a patient of Family Doctor and because her Family Doctor had not assigned treatment of his patients to the hospitalist program. He also stated that once he saw that Ruth was not a hospitalist program patient, he informed Ruth and ENT Surgeon of the situation. In support of Hospitalist's assertion that he did not examine or treat Ruth, he submitted additional designated evidence to show that he did not submit a billing charge for Ruth.

Where—as here—it is clear that "a doctor does not treat, see, or in any way participate in the care or diagnosis of the plaintiff-patient[,]" it is equally clear that "a doctor-patient relationship will not be found to exist." *Miller*, 754 N.E.2d at 46 (quoting *Dixon*, 661 N.E.2d at 607). Because Hospitalist did not treat Ruth and did not perform any affirmative act with regard to Ruth, there was no physician-patient relationship. *See, e.g.*, *id.*; *Dixon*, 661 N.E.2d at 607; *Harper*, 994 N.E.2d at 1238. Absent this physician-patient relationship, Hospitalist owed no duty to Ruth. Accordingly, because Hospitalist has negated the element of duty in Giles's medical malpractice claim and because Giles failed to show that there was a genuine issue of material fact, we affirm the trial court's grant of summary judgment to Hospitalist in this preliminary determination. *See Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007) ("If the nonmovant

13

fails to meet his burden, and the law is with the movant, summary judgment should be granted."), *trans. denied.*

Affirmed.[8]

MATHIAS, J., and BRADFORD, J., concur.

---

[8] As an alternative to showing that there was a genuine issue of material fact regarding the existence of a physician-patient relationship, Giles invokes public policy and out-of-state cases and seeks to have this Court impose or create a duty for Hospitalist—even without the existence of a physician-patient relationship—to have treated Ruth by virtue of the hospital rules and regulations. Giles asserts that "[t]here are considerable public policy reasons for the Indiana Court of Appeals to recognize the significant relationship between [Hospitalist] and [Ruth] as a matter of public policy." (Giles's Br. 18). We, however, decline Giles's invitation to create a duty for a physician based on public policy and absent a physician-patient relationship. *See Harper*, 994 N.E.2d at 1242 (concluding that a physician's agreement entered into with a nurse practitioner to provide consultation to the nurse practitioner did not create a physician-patient relationship with the nurse practitioner's patients and that the physician could only be found to have a physician-patient relationship and have acquired a duty for the nurse practitioner's patients if he performed an affirmative act with regard to such patients).

Giles also argues for the first time that Hospitalist assumed a duty to Ruth. He did not raise this issue below and cannot raise it now on appeal. *See King v. Ebrens*, 804 N.E.2d 821, 826 (Ind. Ct. App. 2004) ("It is well settled that arguments not presented to the trial court on summary judgment are waived on appeal.").